**SYSTEMATIC TOOL & MACHINE COMPANY et al., Plaintiffs,**

v.

**WALTER KIDDE & COMPANY, INC., Defendant.**

**Civ. A. No. 70–1708.**

United States District Court, E. D. Pennsylvania.

Feb. 21, 1975.

Alan H. Bernstein, Caesar, Rivise, Bernstein & Cohen, Philadelphia, Pa., for plaintiffs.

Richard M. Rosenbleeth, Blank, Rome, Klaus & Comisky, Philadelphia, Pa., Jacob C. Kellem, Connolly, Bove & Lodge, Wilmington, Del., Gordon D. Coplein, Darby & Darby, P. C., New York City, for defendant.

## OPINION AND ORDER

FOGEL, District Judge.

### I. HISTORY OF THE CASE AND STATEMENT OF THE ISSUES

#### A. PROCEDURAL CHRONOLOGY OF THE ACTION

This is an action for infringement of United States Letters Patent 3,369,582 (the " '582 patent"). The patent was granted on February 20, 1968, to Clayton Giangiulio for a "Tomato Slicer", a hand-operated device which can make multiple slices of tomatoes for the food service industry with rapidity and efficiency. Plaintiffs claim that two tomato slicers marketed by Walter Kidde & Company infringe upon their rights under the '582 patent. They seek an injunction and monetary damages.

Suit was originally instituted in the Northern District of Illinois against Kidde and several of its customers, but thereafter, on motion of Kidde, was transferred, as to it, to the Eastern District of Pennsylvania. Action against the customers (who were charged with wrongdoing through their purchases of the challenged appliances), was stayed, pending resolution of the aspect of the case which is now before us.

Plaintiff, Systematic Products, Inc. (Systematic), the legal successor to Systematic Tool & Machine Company, is a Pennsylvania corporation; it is the exclusive licensee of the '582 patent, and manufactures and sells a device embodying the patent under the name "Tomato Tamer". Plaintiff Clayton Giangiulio is the holder of the '582 patent, the inventor of the slicer, and is currently an employee of Systematic; plaintiff Dominic D'Ambro owns an interest in the patent pursuant to a con-

tract entered into between him and the other plaintiffs.

Defendant Walter Kidde & Company, Inc. (Kidde) is a Delaware corporation which maintains a regular and established place of business in this district. Kidde in the past marketed two models of tomato slicers under the trade names "Tomato King I" and "Tomato King II" (TK–I" and "TK–II"). It no longer sells these machines, nor, indeed, any other apparatus designed for the same purpose. All of the challenged devices were manufactured for Kidde by Redco, a Delaware corporation, which is not a party to this litigation.

The outcome of this phase of the controversy hinges exclusively upon a resolution of plaintiffs' claim of infringement by Kidde of the '582 patent prior to 1972—the year in which it terminated the sale of the Redco-manufactured equipment.

### B. BASIS FOR JURISDICTION

Jurisdiction is based upon 28 U.S.C. § 1338 and 35 U.S.C. § 281; those sections of the Code create a cause of action for patent infringement and vest jurisdiction to determine such controversies in the District Courts of the United States. Venue lies in the Eastern District of Pennsylvania under 28 U.S.C. § 1400(b), because defendant has a place of business in this district and also has allegedly committed infringing acts within the territorial reach of this Court.

### C. STATEMENT OF THE ISSUES

Two encompassing issues are presented by this controversy, and may be summarized as follows:

FIRST: The validity of the patent and, SECOND: infringement by defendant, if, in fact, the patent is valid.

#### 1. *Criteria for Validity*

Ascertainment of validity, in turn, requires us to resolve the following subsidiary, albeit, critical matters, which are crucial links in the chain plaintiffs must forge if they are to prevail: (1)

anticipation of the patent in the prior art; (2) obviousness from the prior art; (3) the ordinary level of skill in the art.

Moreover, a determination of these subsidiary issues does not end the matter; plaintiffs must also satisfactorily establish: (a) their ability to meet the requisite standards of the so-called secondary tests of commercial success: (i) long-felt need, (ii) failure of others, and (iii) copying by others; (b) their ability to meet the standards necessary to overcome the factors of patent invalidation (including proof that they did not commercially use the device for a period in excess of one year from the date of the patent application was filed); and (c) their ability to prove that the patent documents set forth the "best mode" for performance.

#### 2. *Tests of Infringement*

Disposition of the second major issue, infringement, calls for solutions to the following problems: (1) the scope of claims of the patent in controversy; (2) the issue of literal infringement of those claims; (3) the applicability of the doctrine of "file wrapper estoppel"; (4) the relevancy of the "doctrine of equivalents"; and, finally, (5) plaintiffs' proof of willful and wanton infringement.

We begin with the threshold question of validity of the '582 patent. Only after a positive finding as to that matter, can appropriate inquiry be made into the claim of infringement.

As a result of our review of the entire record of this case, which consists of: (a) the testimony and exhibits adduced at the trial; (b) agreed-upon stipulations of fact; (c) certain answers to interrogatories; (d) agreed-upon portions of pre-trial depositions, together with other documents and data developed in the discovery phase of the litigation; (e) the final pre-trial Order of the parties; (f) the requests for findings of fact and conclusions of law; and, finally, (g) the arguments and comprehen-

sive briefs in support of their respective contentions; we make the following:

## II.  FINDINGS OF FACT

### Procedural History of the Action

1.  Plaintiff Systematic is a Pennsylvania corporation doing business within the Eastern District of Pennsylvania. Systematic is the exclusive licensee of the '582 patent, and manufactures and sells a device under the name "Tomato Tamer". Plaintiff Giangiulio is the inventor and holder of the '582 patent. Plaintiff D'Ambro owns an interest in the '582 patent.

2.  Defendant Kidde is a Delaware corporation with a regular and established place of business within this district. By stipulation, Kidde has committed an act of alleged infringement in this district after the date of issuance of plaintiff's patent.

3.  Defendant Kidde has sold, but has never manufactured, the "TK–I" and the "TK–II" tomato slicers. Neither appliance is now sold by Kidde. Both models of the device were manufactured by Redco, a Delaware corporation, which is not a party to this suit.

4.  This action was originally begun in the Northern District of Illinois against Kidde and several of its customers. It was subsequently transferred to the Eastern District of Pennsylvania, with Kidde as the only remaining active defendant. Suit was stayed as to all other defendants, pending disposition of the litigation before this Court.

### Background of the Patent in Suit

5.  Prior to May 4, 1967, the date that application Serial No. 636,176 was filed, tomato slicing by those engaged in the business of food preparation and service was accomplished by such diverse methods as: (a) hand slicing, (b) slicing by means of commercial electric meat slicers, or (c) slicing on large-scale multi-purpose food processing machines. None of these techniques was suitable for the entire spectrum of food service establishments which use sliced tomatoes in vastly differing quantities, the volume varying with the nature of the particular operation, and with changing demands within any given establishment itself, depending upon the nature of the particular business.

6.  The hand-wielded knife can make only one cut at a time; the evenness of the slices depends upon the accuracy of the wielder; personal injury may result from the bare knife blade; the heel of the tomato may be too difficult to cut, thereby creating waste; use of a knife requires extensive physical handling of the fruit, increasing the danger of bacteria, spoilage and general lack of sanitation; this method intensifies exposure to air on all sides, thus increasing the rate of deterioration of pre-sliced tomatoes. Finally, it is difficult to reassemble the individual slices for storage in a manner that will shield the raw edges from exposure to the atmosphere.

7.  The commercial meat slicer is relatively expensive, usually costing over $500.00 per machine. Production is at the rate of one slice per pass; the individual slices scatter about the pan, and the decomposition problems presented parallel those arising from the use of a knife. The mass of the follower, an integral part of the machine, can squash part of the tomato with resultant waste. The cutting process releases quantities of juice, frequently causing time-consuming clean-up procedures. Acids in the juice attack the slicer parts, particularly the blades, eventually resulting in damage to the equipment. Moreover, since the primary purpose of the slicer is to cut meat, its diversion for tomato-slicing frustrates the achievement of optimum efficiency in connection with over-all food preparation.

8.  Multi-purpose slicing machines will slice tomatoes; however, this equipment typically costs at least $2400.00 per unit.

9.  Hand operated mechanical vegetable slicers, such as the "Vegematic", cannot slice tomatoes; they mangle them instead.

*Development of the Patent in Suit*

10. Clayton Giangiulio, while operating a delicatessen in 1965 and 1966, was struck by the absence of relatively inexpensive and simple equipment to slice tomatoes. After rejecting all of the devices on the market because of various infirmities, he set about to invent such an implement. His criteria for the machine were: (a) moderate purchase price, (b) ability to slice tomatoes of different size and texture, (c) ease of cleaning, (d) speed of repetitive slicing, and (e) creation of nontemperamental instrument.

11. Mr. Giangiulio's analysis of the problems which made other machines, such as the common "Vegematic" device, unsatisfactory for commercial tomato slicing, led him to focus on the nature of the fruit itself. Tomatoes possess the peculiar features of a very tough outer skin and a soft, virtually structureless interior. This contrasts sharply with foods such as onions or apples, which have considerable structural integrity, even when quite ripe. Unripe or barely ripe tomatoes may possess such rigidity, but ripe and over-ripe tomatoes, in a word, are mushy. Such tomatoes create serious problems for preparers because the practice in the food-service industry is to purchase in bulk, typically enough for a week, in order to take advantage of the attendant savings. By the end of a week, a large quantity of the supply becomes soft, and, therefore, would be wasted, if ordinary slicing methods had to be employed.

12. Typical existing slicing machines, at the time, forced the blades through the fruit; pressure buildup inside the tomato then either exploded it, or if the first cut were accomplished, the skin, more often than not, would be shredded. Further pressure on the damaged tomato would squash the fruit, although once the tomato was sliced about one-third through, direct pressure could be applied to complete the slicing action without additional damage. The basic solution, Mr. Giangiulio concluded, was the creation of an appliance which could pierce the skin smoothly, before pressure had built up within the tomato.

13. Mr. Giangiulio, drawing upon his experience as a tool and die maker, worked for several months on the project, and finally produced an operable prototype in March, 1966. The machine incorporated a racked set of thin, nonserrated blades, a supporting base, and a pusher mechanism. The fruit was introduced into the blades at a shallow angle. A shearing action generated by the movement at this shallow angle to the blades would, and did pierce the skin of the softest tomato before the pressure reached a point that shattered the fruit; it was then pushed through the blades, until the slicing operation was complete. The pusher design which controlled the path along which the tomato was moved, constrained the fruit within relatively narrow limits. The pusher was slotted to match the spacing of the multiple blades, with the result that several slices could be made simultaneously, and the tomato could consequently be passed completely through the blades. The instrument was hand-operated, could be fabricated in a machine shop at a relatively low cost, and was capable of repeatedly slicing whole tomatoes in any stage of ripeness, at a rate of approximately one tomato per second. Very little residue remained, and such leavings could be removed easily, with the result that the cleanup process was a simple one; the device was easy to operate; it did not expose the tomato's interior to atmospheric contamination; physical handling was limited to placing the fruit in the slot of the pusher and picking up the still-assembled sliced tomato; slices were uniform, and no waste resulted, even when over-ripe tomatoes were cut in this manner.

14. Mr. Giangiulio was advised to make his preferred embodiment marketable after he sought advice with respect to patentability. He therefor made changes to improve the aesthetics, the ease of tooling, operation and cleaning, and the longevity of a production model. One of these machines, called the "Lexan

machine" (because of the plastic composition of the pusher), was given to a patent attorney for the preparation of drawings and the filing of an application in May, 1966. The "Lexan machine" was never sold to the public because (1) the tooling and material costs for a plastic pusher were discovered to be far too high for the production contemplated at that time, and (2) the blades tended to catch in the pusher slots about ten per cent of the time, thereby jamming the machine during those periods of operation. Substitution of an aluminum pusher solved both problems. In July, 1966, the first twenty-five production machines, which had aluminum pushers, were ready. That model, with some further non-functional aesthetic changes, is still the device that is currently marketed by Systematic under the name "Tomato Tamer".

15. Sales were immediate and satisfying; over 20,000 machines had been sold at an average price of $79.00 per unit when this action was tried. This is impressive volume, particularly in view of plaintiffs' modest promotion and advertising campaign, the general pattern of single purchase (blades can be replaced without need for a new unit), and the specialized use of the apparatus, which slices tomatoes only, and is not interchangeable with meat slicers, or other multi-purpose food-cutting equipment.

### The Patent in Suit

16. The initial application for patent, Application Serial No. 636,176, was filed on May 4, 1967, and was expedited because of a suspected infringement. That application with subsequent amendments was initially rejected for two reasons: FIRST, indefiniteness, and, SECOND, alleged obviousness, based upon two prior patents reviewed by the Examiner. A meeting was held with the examiner, as a result of which the claims were clarified by additional specifications for certain angular relationships. The rejection for obviousness was withdrawn, and, on February 20, 1968, the patent was granted on new claims which essentially repeated those originally put forth, as augumented by the information with respect to the angular relationships and the basis for their measurement.

17. The '582 patent discloses the method of solving the problem associated with high-speed mechanized slicing of tomatoes, and a specific embodiment of that solution. In essence, it reveals a base, a rack of blades and a pusher assembly mounted on the base, a means to move the base and the blades relative to each other, and certain angular relationships among the component parts.

18. The '582 patent further discloses that the path of movement is to be at an angle of less than 40°, and preferably 30°, to the cutting surface of the blades.

19. The '582 patent also describes a design of pusher assembly, consisting of a leading arm, a trailing arm, and a curvilinear fillet called the pocket; that portion of the device is a "Y"-shaped array capable of supporting a tomato. The pusher is cut by slots which permit it to mesh with the blades so that the tomato is sliced completely.

20. The '582 patent also reveals certain angular relationships among the blade edges and the leading arm, the trailing arm, and the path of movement, so that a tomato is confined laterally, and can be introduced into the blade array at a specified angle.

21. The effect of the angular relationships is described as achieving a smooth shearing action as the tomato is pushed against and through the blade array in a manner that uniformly makes thin tomato slices, essentially undamaged, while the tomato holding pocket slots allow the blades to pass through the tomato entirely, thus achieving the goal of rapid slicing of pieces of uniform size.

22. The preferred embodiment suggests certain materials for some parts, and involves rectilinear operation, in that the pusher travels along a straight path.

## VALIDITY

### Anticipation

23. The following six patents were cited by defendant as establishing the scope and content of the prior art for the purpose of showing anticipation of the patent in suit:

| | | |
|---|---|---|
| French Patent | 1,085,144 | (Birambeau) |
| United States Patent | 2,009,913 | (Bever) |
| " " " | 503,903 | (Curtis) |
| " " " | 236,178 | (Rice) |
| " " " | 1,882,139 | (Giuffre) |
| " " " | 2,466,121 | (Norman) |

24. The Birambeau patent describes a hand-held pusher shaped to fit a spherical fruit such as a tomato, with slots designed to fit the blades in a hand-held (not patented) multiple blade slicer. The purpose of the invention was to permit the fruit to be forced all the way through the blades without cutting the operator's fingers. It operates through the placement of the pusher over a partly-sliced tomato, which is then put through the rack of blades under the pressure created while pushing it through with a rocking back and forth motion.

25. The Bever patent describes an apparatus to slice buns into two or more parts. It consists of a heavy blade within a housing, together with a "J"-shaped pocket to pull a bun past the blade. The blade is fixed at an angle to the direction of its own motion.

26. The Curtis patent discloses an instrument to slice apples and other structurally solid fruit into multiple slices, with each slice positioned individually after cutting is completed, so that it may dry prior to canning. It is described as an improvement upon existing machines for that purpose. To perform this task, it relies upon an array of blades staggered one to another, and perpendicular to the motion of the pusher. To prevent distortion of the blades and resultant shredding of the apple slices, the fingers of the pusher are engaged with the blades whenever the fruit is positioned between them. The blades themselves are perpendicular to the path of movement of the fruit. They are thick and rigid.

27. The Rice patent describes a rotary device, with a radial blade array staggered along a central axis which also supports a pusher. There is a right-angle relationship between the path of movement and the cutting surfaces of the blades. The pusher does not provide support for a tomato as it moves through the blades.

28. The Giuffre patent discloses an implement for passing a loaf of bread dough through a rack of fine wires, thereby cutting the loaf into multiple slices. The blade rack is mounted to move radially along an axis almost in the plane of the dough holder.

29. The Norman patent describes an appliance for mechanical slicing of relatively rigid vegetables into convenient lengths for food preparation. The machine is nominally a rotary machine, and the blades, during the slicing process, are perpendicular to the path of movement of the fruit.

### Obviousness

30. The basic elements of fruit and vegetable slicers, consisting of blades, pushers, bases, and means for relative movement, were well-known in the prior art.

31. The United States Patent Office has long recognized that innovation can exist in particular unique designs and original arrangements of otherwise general elements which may have existed separately or in different relationships in the prior art.

32. The peculiar qualities of tomatoes—their tough outer skin and soft, juicy interior—create a critical problem of pressure build-up during slicing. Plaintiff's solution embodies innovative and unique developmental work which resulted in this invention.

### Secondary Tests

1. *Commercial Success*

33. When placed on the market, the patented equipment enjoyed outstanding

commercial success. Over twenty thousand units have been sold to a broad variety of food preparation and purveying establishments. The food preparation and food products sales industries have wholeheartedly received the slicer. Customer reaction has been uniformly enthusiastic.

34. No other device existed, until plaintiffs' invention came on the market, which could efficiently and economically slice tomatoes at a high rate of speed for food service operations.

35. The patented machine enjoyed such outstanding success that other manufacturers have developed competing products which also perform the sole task of slicing tomatoes.

### 2. *Filling a Long-Felt Need*

36. No apparatus was available on the commercial market which could slice tomatoes rapidly, with minimum mess and waste, at a reasonable cost to potential users, before the emergence of the "Tomato Tamer".

37. Evidence with respect to prior patents establishes that specialized slicer markets have existed for many years.

38. The evidence has also demonstrated that a need existed for an effective, simple, and inexpensive tomato slicer for many years.

39. Plaintiffs' appliance has been accepted with unqualified approval by operators who run the gamut of food service enterprises.

### 3. *Failure of Others*

40. Prior to Mr. Giangiulio's invention, no reasonably priced devices were on the market which could slice tomatoes efficiently, quickly, without waste and without temperament.

41. Demand for such a tomato slicer had existed for many years, and it created an incentive of long duration to develop a unit that would solve the problems peculiar to this particular foodstuff.

### 4. *Copying*

42. The "TK–I" was virtually a direct copy of the preferred embodiment of the '582 patent.

43. The incentive to copy the '582 patent was to compete with that machine for sales in the same market.

### *Invalidation Issues*

### 1. *Public Use*

44. Whether it was an early version, or the final version of the slicer which was used for tests at the delicatessen prior to May 4, 1966, the machine was kept from public view.

45. Irrespective of the particular unit which was subjected to testing at the delicatessen prior to May 4, 1966, the products of those experiments were destroyed, and were not consumed in sandwiches or platters that were publicly sold.

46. Any use of a final prototype for the purpose of slicing tomatoes, if such a machine were so employed more than one year prior to the May 4, 1967 filing date, was solely experimental, and for the sole purpose of definitively improving the equipment.

47. There was no sale or offering for sale of the subject of the patent to the public prior to May 4, 1966.

### 2. *Failure to Set Forth the Best Mode*

48. The '582 patent specification states that the

pusher is preferably made of a strong hard plastic. It has been found that a polycarbonate resin, a thermoplastic material, is satisfactory. A suitable such resin is that sold under the trademark Lexan of the General Electric Co.

The specification also states that "the pusher [is] preferably of plastic, although other materials may be used." Additional directions in the specification establish that the pusher is to be impermeable to the liquids unleashed by a sliced tomato, and sufficiently rigid to

permit it to push a tomato through the rack of blades.

49. The performance of the "Lexan machine" equals that of the aluminum machine when the width of the slots is the same on both pieces of equipment.

50. No specification as to the width of the slots was given in the patent. Instead, the patent claims and specifications disclosed that the pusher must mesh with the blades; thus these claims give guidance to anyone trying to follow or understand the claims.

51. The tooling costs for equipment to produce plastic pushers were estimated to have been at least $11,000 in 1966, and are, in fact, currently over $22,000. Aluminum pushers, however, can be made on existing equipment with an outlay of some $2000 for an extrusion mold. The cost differential was prohibitive for the small production run contemplated in 1966; it far outweighed any savings in labor which would result from the production of plastic pushers. Moreover, the same extrusion mold can be used for manufacturing any pusher, irrespective of the spacing of the slots and blades, while a new injection mold is required for each slicer which differs in size and spacing. This is a critical cost factor, because the only way to change the size of the slices is to change the spacing between the blades.

52. Regulations of the Food and Drug Administration have changed the grade of "Lexan" required for use in equipment for food preparation. These regulations require a quality of "Lexan" which would cost more than five times as much as the material contemplated originally.

## INFRINGEMENT

53. Defendant does not dispute its lack of authority from plaintiffs to use the '582 patent.

54. The material elements of claims 1 and 8 of the '582 patent are: [1]

(a) base

(b) array of blades mounted on a base

(c) pusher assembly mounted on a base

(d) means to move the blades and the pusher assembly relative to each other

(e) pusher with a leading arm and a trailing arm

(f) pusher arms which create a tomato-holding pocket

(g) pusher arms with slots for the reception of blades

(h) blade array at an angle of less than forty degrees to the pusher path of movement

(i) angle between pusher leading arm and trailing arm that is greater than ninety degrees

(j) angle between pusher leading arm and cutting edge of blades that is less than ninety degrees

(k) small acute angle between trailing arm and cutting edge of blades; whereby

(l) the pusher achieves a smooth shearing action

(m) with the tomato urged against and through blades

(n) with slots which allow the blades to pass through the fruit

### The "TK–I"

55. The defendant has stipulated that the "TK–I" infringes at least some of the claims of the '582 patent.

56. The deposition evidence establishes that some sales (although the precise number is uncertain) occurred after the date of issuance of the '582 patent.

### The "TK–II"

57. Defendant has stipulated that there were sales after February 20, 1968.

58. None of the claims of the '582 patent can be read literally to cover the "TK–II" machine.

---

1. The phraseology is ours and is not a verbatim quote from the '582 patent.

*File-Wrapper Estoppel*

59. There was an initial rejection of all of the claims of the patent; some were rejected on grounds of indefiniteness, and some on the basis of unpatentability, because of the existence of two prior art patents. Original claim 1 was rejected for both of these reasons.

60. The new claims 11 and 18, which were submitted after a conference with the patent examiner, were substantially identical to the original claim 1; the differences are found in the explanation of the angular relationships.

61. The new claims, with the clearer description of the means of measurement of the angles, were accepted by the patent examiner, and a patent issued on the basis of these amended claims. The objection of lack of patentability was dropped.

*Doctrine of Equivalents*

62. The particular angular relationships related in the claims of the '582 patent's pusher are descriptive of a surface which can control and constrain the path of the tomato within specified limits.

63. The pusher of the "TK–II" controls and constrains the movement of the tomato so that it follows a designated and predictable path through the blades.

64. The pushers of the two tomato slicers ("Tomato Tamer" and "TK–II") are interchangeable without disrupting the operation of either machine.

65. The crucial phase of the cutting cycle is the first third, at which stage the skin of the tomato is pierced and slit.

66. The pushers of the "Tomato Tamer" and of the "TK–II" bring the tomato into contact with the cutting edges of the blades along a path of movement which is at a shallow angle to those blades. Slicing at this shallow angle is maintained for at least the first third of the process.

DAMAGES

67. The case has been bifurcated and assessment of damages, if any, has been deferred, pending disposition of the liability aspects of the matter.

## III. DISCUSSION

*Background of the Patent in Suit*

Application Serial No. 636,176 was filed with the United States Patent Office on May 4, 1967. Prior to that time, those engaged in the myriad operations which are part and parcel of the food service industry sliced tomatoes through any number of methods.

Employees could be detailed to slice tomatoes by hand with ordinary paring or kitchen knives, the same technique which is most commonly employed when tomatoes are prepared for domestic consumption in the home. While this procedure may be suitable for occasional small-scale tomato slicing, it has serious drawbacks in large-scale feeding operations. Testimony adduced at the trial established that one large restaurant in the Philadelphia suburban area, for example, required over 20,000 slices of tomatoes each week. Volume of this magnitude makes hand slicing impractical. Fast food operations also use vast quantities of sliced tomatoes, as do institutional operators. At the other end of the scale are the delicatessen and "hoagie" shops, which use sliced tomatoes as a staple for sandwiches and platters purveyed for retail on-the-spot, or take-out consumption. Volume of use in these establishments, obviously, is sharply below that of the large chains and restaurants, but the need to have slices instantly available for rush periods, with suitable storage during slack hours, is critical to the operation of these businesses. In all of these situations, time-consuming preparation by hand is economically unsatisfactory.

Problems presented by hand slicing are detailed in Finding of Fact 6; they relate to speed, uniformity, safety,

waste, hygiene, spoilage, and the need for advance preparation and storage during peak needs. This evidence supports the finding that manual slicing was not, and is not satisfactory for commercial food service.

Attempts to mechanize the slicing of tomatoes have met with uneven success. Large multi-purpose machines are available from manufacturers such as Hobarth, but the price of $2400 or more per machine is one that may be prohibitive to the small commercial user, thus putting this equipment beyond the reach of the average private entrepreneur who owns or operates a delicatessen or small restaurant. Electric meat-slicers are, at times, used to slice tomatoes. These machines usually cost $500.00 each, or more. However, this machinery is primarily designed for meat slicing, and utilization for tomato preparation requires diversion from the intended purpose. Other problems, as detailed in Finding of Fact 7, also make this machine unsatisfactory for slicing tomatoes on a commercial scale.

The variety of hand-operated vegetable slicers simply cannot slice a tomato. Thus, from the evidence presented on this score, we conclude that a reasonably priced tomato-slicing device, which was capable of doing the job in an efficient and economical manner was not available to the food-service trade. Moreover, none existed which did not have serious attendant difficulties and disadvantages. It was against this backdrop that Mr. Giangiulio developed the invention that is the basis of the patent in suit.

The development and nature of this patent are the subject of Findings of Fact 10 through 22. These have been analyzed on the basis of the documents and other evidence that constitute the record in this case. Repetition of the salient facts is superfluous. Therefore, we will proceed to a review of the legal questions raised by this litigation. The threshold issue is the validity of the '582 patent.

## VALIDITY

We have concluded from the information cited in the introduction to this opinion that the '582 patent possesses both novelty and utility. 35 U.S.C. §§ 101, 102. The validity question is essentially threefold: (1) Anticipation—Was the patent disclosed in the prior art? (2) Obviousness—Was the patent a natural, non-innovative outgrowth of the prior art? (3) Invalidation—Has the privilege of patent protection been defeated by certain actions or inactions of the inventor?

Within this structure, several additional factors must be considered. In deciding the issue of anticipation, the prior art must be determined. In discussing obviousness, one looks at the level of skill in the field, the nature of the change from the prior art, and the input from the secondary tests for commercial success: filling a long-felt need, failure of others, and copying. Invalidation encompasses the issues of public use and failure to state the best mode. We will discuss each of these factors within the framework of the particular parent issue to which it is subsidiary.

### Anticipation

The defendants have cited six patents, one of which is a foreign patent, in order to establish the scope and the content of the prior art. *See* 35 U.S.C. § 102. These patents are as follows:

| | | | | |
|---|---|---|---|---|
| French | Patent | | 1,085,144 | (Birambeau) |
| United | States | Patent | 2,009,913 | (Bever) |
| " | " | " | 503,903 | (Curtis) |
| " | " | " | 236,178 | (Rice) |
| " | " | " | 1,882,139 | (Giuffre) |
| " | " | " | 2,466,121 | (Norman) |

We will discuss each *seriatim*.

1. The Birambeau patent describes a hand-held pusher shaped to fit a spherical fruit, such as a tomato. The pusher has slots which mesh with a hand-held rack of thin blades. The blade rack is not patented. The patented device was designed to solve a problem created by the hand-held slicer. One introduces a

tomato into the blades and saws through it with a reciprocating motion. At a certain point, the blades get very close to the operator's fingers. The operator may at that point move his hand to the underside and pull the tomato through. The pusher allows the operator to continue pushing, and eliminates the danger of cutting his own fingers along with the tomato. The tomato slicing must be started by hand, and the device will complete the process only after initial slicing by hand. We conclude that this machine does not foreshadow or disclose a mechanical, high-speed, single-pass slicer such as the subject matter of the patent in suit.

2. The Bever patent was designed as a bun slicer. Its avowed purpose was to split buns into two or more slices. It consists of a heavy blade placed at an angle to the direction of motion, and a "J"-shaped pocket designed to pull a bun past the blade. The pocket design of the Bever patent does not restrain a tomato, so that it passes cleanly through a blade, or an array of blades; the blade design is incapable of passing cleanly through a tomato and producing multiple slices. No reasonable adaptation of the machine will perform such a function. Hence, we conclude that the Bever patent neither suggests nor discloses the subject matter of the patent in suit.

3. The Curtis patent describes a device designed to slice apples and other structurally solid fruit into individual pieces which are separated in the process so that they may dry prior to canning. The patent describes itself as an improvement upon existing machines for that purpose. To produce slices and lay them out separately, it uses an array of blades that are staggered one to another. The blades are laid out perpendicularly to the path of movement of the fruit and pusher. In order to prevent distortion of the blades and the resultant shredding of the apple slices, the fingers of the pusher are engaged in the blades whenever the fruit is situated between them. The patent thus presents yet another example of known elements (pusher, blade rack, base), performing the operation of slicing a particular kind of fruit in a particular manner for a particular purpose. The device is incapable of high-speed, repetitive slicing of a tomato into multiple slices; it would destroy the structural integrity of the fruit. The blades are at a perpendicular to the path of movement. They are also quite thick and rigid, and thus cannot slice an entire tomato rapidly at a single pass. The pusher design is utterly incapable of supporting and guiding a soft fruit through the blades without totally demolishing it. The Curtis patent does not disclose or suggest the subject matter of the patent in suit.

4. The Rice patent was also designed for slicing apples and other structurally rigid fruit. It consists of a rotary device, with a radial array of blades staggered along a central axis which also supports a pusher. The relationship between the path of movement and the blade line is tangential at any blade; that is, at a perpendicular. If the Rice device were utilized in an attempt to slice a tomato, it would destroy it. The angle between the pusher and the blades is such that those members would squeeze and thus obliterate the fruit; moreover, there is not enough support for the tomato as it passes through the blades. The patent does not itself disclose or suggest a successful, high-speed, mechanical tomato slicer such as the subject matter of the patent in suit.

5. The Giuffre patent describes a device for slicing a loaf of raw bread dough into a row of individual slices. This is achieved by passing a rack of fine wires through a loaf of dough on a slotted holder. The rack of wires is mounted so as to move radially along an axis almost in the plane of the dough holder. Such a machine is not capable of slicing a tomato cleanly; in all probability, it would dent or squash the tomato. No obvious modifications would overcome the problem. The blade line is essentially at a right angle to the path of movement during the entire slicing operation. The blades could not provide

the resistance to flexing necessary to pierce the skin. The Guiffre patent does not disclose or suggest the subject matter of the patent before us.

6. The Norman patent discloses a device for mechanical hand slicing of a relatively rigid vegetable into convenient lengths for preparation for consumption. Essentially, the slicer is a rotary machine with the pusher pivoting along an axis in the plane of the stationary blades. The relative path of movement of the fruit is perpendicular to the blades. The Norman machine could not slice tomatoes cleanly, smoothly, or quickly. Hence, we conclude that the Norman patent does not disclose or suggest the subject matter of the patent in suit.

■ Thus, an analysis of the prior art leads us to conclude that plaintiffs' patent was neither disclosed, nor suggested by it. We also have determined that the prior art consisted of designs for pushers, blade racks, means of moving the pushers and the blade racks, both separately as well as in relation to each other, and bases to support the entire mechanism. All or some of these elements can be and have been arranged in specific patterns in order to accomplish particular functions.

### Obviousness

The prior art is reflected in a variety of slicers and choppers, each designed to deal with the *specific problems* which are *peculiar* to a variety of individual foods and to perform different tasks in connection with the cutting or slicing of particular foodstuffs. While it is true that the individual components and elements are well known in the prior art, there is a synergistic result obtained through particular relationships among them. Trio Process Corp. v. L. Goldstein's Sons, Inc., 461 F.2d 66, 71 (3d Cir.), cert. denied, 409 U.S. 997, 93 S.Ct. 319, 34 L.Ed.2d 262 (1972). *See* 35 U.S.C. § 103.

■ We find that the crucial development work on this patent was the result of a pinpointed analysis of the difficulties in slicing tomatoes in large quantities, which thereafter resulted in the creation of a device to solve these particular problems. We refer to the difficulty of pressure build-up and the related obstacles that are caused by the combination of a tough outer skin and an interior with no structural integrity. The solution required development of a process for piercing the tough outer skin without creating interior pressure that would destroy the soft internal mass of the fruit. Thus, the key to the solution was putting together known elements— blade racks, pushers, means for relative movement, supporting bases—in an assembly which would perform this task quickly, smoothly, and economically without either waste of the food itself, or of the time of the operator performing the function. Nothing in the prior art could accomplish this.

■ We note that the prior art did, in fact, consist of patents issued for machines designed to solve the particular slicing problems peculiar to individual foodstuffs; this further buttresses plaintiffs' thesis that the United States Patent Office has frequently found patentable innovation in solutions which overcome the unique dilemmas associated with the mass cutting or slicing of particular foods. Patents are presumed valid. 35 U.S.C. § 282. This is particularly so when, as in the instant case, significant prior art is cited. *See, e.g.,* Anderson Co. v. Sears, Roebuck & Co., 265 F.2d 755 (7th Cir. 1959). The recurring pattern of patent issuance for means which deal with specialized problems further suggests that we examine this patent with a presumption of validity.

There was no additional evidence submitted to establish the ordinary level of skill in the art. We have determined from the patent material submitted by the defendant and discussed above, that the ordinary level of skill in the art of food slicing is that possessed by an individual performing that task. Our conclusion is based on the following fac-

tors: (1) the central factor in the development of a food slicer is the identification of the unique problems associated with the preparation of a particular category of fruits or vegetables; (2) while diverse elements of food slicers are well-known in the art, it is the synergistic result of arranging these elements in a specific manner that is significant in the issuance of a patent for the invention; (3) it would be unusual for an engineer to have either the need for such a device, or the method of accomplishing the desired result; and (4) the activity of an engineer in those circumstances would be cumulative toward a successful embodiment of the concept, and not independent of the actual creative work involved in isolating the problems before arriving at a solution.

█ This conclusion is consistent with the result in prior cases which have held that patentable invention can lie in the recognition of a problem and promulgation of a solution, as well as in the actual construction of an embodiment of that solution. 1 Deller's Walker on Patents 2d ed. § 43 (1964).

We have heard the evidence of defendant's expert engineering witness. We understand his testimony to mean that slicers are interesting developments of known technology and that, while a particular slicer may be an extremely efficient, and well-designed piece of machinery, there is no invention in putting a slicer together. However, in light of the prior art, and of our determination of the ordinary level of skill in the art, we disagree with his opinion as to the obviousness of the '582 patent. This does not mean that one could validate a patent for a different slicer for each fruit or vegetable that is purveyed in the United States. What we hold is that the problem posed by the need to find a fast, efficient, and economical way to slice tomatoes in large quantities did present the singular challenge that called for a unique answer. We find that the subject matter of the '582 patent is not obvious to an individual possessing the average level of skill in the art, in light of the prior art existing at the time the invention was developed and the application was filed; the inventor of the '582 patent, Clayton Giangiulio, did not know of the existence of any device which suggested to him the machine he devised. Rather, the '582 patent was the product of his own independent and original development, and hence we disagree with defendant's contention of obviousness from the prior art.

### Secondary Tests

█ This conclusion is buttressed by the evidence relative to the secondary tests to be considered. The criteria are set forth in Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), and recently were repeated in the Third Circuit's opinion in Trio Process Corp. v. L. Goldstein's Sons, Inc., 461 F.2d 66, 70–71 (3d Cir.), cert. denied, 409 U.S. 997, 93 S.Ct. 319, 34 L.Ed.2d 262 (1972). These tests include commercial success, filling a long-felt need, failure of others to develop the invention, and copying by others. We will discuss each category separately.

### 1. Commercial Success

There is overwhelming evidence of the immediate and astounding commercial success of plaintiffs' invention in the market. Sales records show that over 20,000 slicers have been sold since the first production commenced in mid-1967. This sales volume is extremely significant, because most purchases are one-time affairs, with replacement parts only, such as new blades, the subject of reorders thereafter. Furthermore, there has been virtually no advertising by the plaintiffs, with the result that most of the purchases came through recommendations by satisfied customers to other potential users.

The testimony was undisputed with respect to the exceptional performance of the "Tomato Tamer" in achieving the desired goals for its users. A diverse market exists, ranging from large institutional and fast-food chain operations

to smaller restaurants and local sandwich shops.

The sales results point up the significance of the secondary test of commercial success—the reception given this device in the market place is an indicator of the innovative character of this patent. The test is not one which is determinative of validity. However, it does help "to give light to the circumstances surrounding the origin of the subject matter sought to be patented." Graham Tank, *supra*, 383 U.S. at 17–18, 86 S.Ct. at 694. The reaction in the market place is a factor to be considered by the Court, which is "most ill-fitted to discharge the technological duties cast upon it by patent legislation * * *." It serves to " 'guard against slipping into use of hindsight,' * * * and to resist the temptation to read into the prior art the teachings of the invention in issue." *Id.* at 36, 86 S.Ct. at 703. Thus, the test provides practical guidance to the Court, even though it is not legally dispositive of the issue of validity. We conclude that the evidence of commercial success of the "Tomato Tamer" is additional support for the proposition that it is a new and useful innovation worthy of patent protection.

### 2. *Filling a Long-Felt Need*

This secondary test is akin to the tests of commercial success and failure of others to achieve that success. That a receptive market, which was not satisfied, existed for this device over a long period of time suggests that others would be striving to produce the subject matter of this patent, and hence underscores the conclusion that the invention was not obvious to those who did work on it. Evidence was presented at the trial which demonstrated the absence from the market of a commercially feasible machine which could slice tomatoes for mass food preparation.

We are satisfied that an eager food trade was waiting for such equipment with increasing need and desire as mass food operations have grown over the years. That market has not, as defendant has argued, been created solely by the development of the fast-food industry. The diversity of the food operations of the purchasers contradicts defendant on that score. Indeed, the food slicer patents introduced into evidence by defendants go back many decades, and reveal that the long chain of efforts to develop specialized slicers is not a new development. To the contrary, we find that a market has existed for well over a decade for a machine which would eliminate slicing tomatoes by hand, and would also obviate the necessity of using expensive electric machinery for that same purpose. The "Tomato Tamer" has been widely acclaimed for its ability to satisfy those needs in the market for which it was designed.

### 3. *Failure of Others*

Prior to the introduction of plaintiffs' device, no products on the market existed that were capable of performing the task which plaintiffs' invention so successfully performs. We are satisfied, as noted, that the market for this equipment existed for an appreciable period of time, at least in excess of a decade, and that such a market indeed created an incentive for inventors to produce a successful tomato slicer. The inference is that other potential inventors would have developed such a slicer, had they been able to do so. The vacuum which existed until Mr. Giangiulio invented his machine is again valid secondary evidence of the non-obviousness of the subject matter of the '582 patent.

### 4. *Copying*

Evidence was put before the Court that a tomato slicer, known as the "TK–I", and marketed at one time by the defendant, was developed by non-parties to compete with the machine produced by plaintiffs. The machine was apparently developed from a description of the "Tomato Tamer". It has been stipulated that the "TK–I" device, which was manufactured by Redco, infringed upon some of the claims of plaintiffs' patent. In fact, but for some insignificant stylistic details, the "TK–I" is a virtual

copy of the "Tomato Tamer"; thus, the evidence establishes that the "TK–I" was produced in order to compete with the plaintiffs' machine on the market.

While it is clear that there is no legal impediment to copying an unpatented article, *see* Sears, Roebuck & Co. v. Stiffel Co., 376 U.S. 225, 231, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964), and that evidence of copying prior to issuance of a patent is therefore irrelevant to the issue of infringement, such evidence may be pertinent for other purposes. *See* Troy Co. v. Products Research Co., 339 F.2d 364, 367 (9th Cir. 1964), petition for cert. dismissed, 381 U.S. 930, 85 S. Ct. 1762, 14 L.Ed.2d 689 (1965). *Cf.* Subtests of "Nonobviousness": A Nontechnical Approach to Patent Validity, 112 U.Pa.L.Rev. 1169, 1178–80 (1964). The inferences that may be drawn from copying here are two-fold. *First,* copying suggests that there was significant innovation in the invention which has been patented. *Second,* it suggests that the invention is significantly useful so that competitors must react in some way if they are to remain in business. While neither of these inferences can be considered in connection with the *threshold question* of *obviousness,* they are significant *secondary indicators* and are relevant to a finding of *non-obviousness.*

All of the pertinent secondary tests support the conclusion that the '582 patent is preliminarily valid, and has met the fundamental tests of novelty, utility and non-obviousness.

### Invalidation Issues

Even though an invention may be found patentable under the basic tests found in 35 U.S.C. §§ 101–103 (utility, novelty, non-obvious subject matter), the patent may yet be invalid for failure to meet several other secondary conditions. The rationale for these qualifications stems from the purposes of the patent laws, designed as they are, to "promote the Progress of * * * useful Arts, by securing for limited Times to * * * Inventors the exclusive Right to their * * * Discoveries", U.S. Const. art. I, § 8. Because the Constitution envisaged a limited monopoly in return for full disclosure of the invention, and because progress was felt to be enhanced by disclosure of invention and hindered by secrecy, the statutes of Congress which were derived from the constitutional clause have all included incentives for speedy and full disclosure. These incentives may also be viewed as penalties, through denial of patentability, when there is failure to note a prompt, complete, and public disclosure of the subject matter of the invention. *See* Graham v. John Deere Co., *supra.* In the case at bar, defendant has averred that plaintiffs' noncompliance with two fundamental precepts has invalidated the patent, and the challenged conduct consists of: *First*: the alleged public use of the patent's subject matter more than one year prior to the filing of the application in contravention of the provisions of 35 U.S.C. § 102, and, *Second*: the alleged failure on the part of the inventor to set forth the best mode contemplated by him for carrying out his invention, as required by 35 U.S.C. § 112. We will deal with each point separately.

### 1. *Public Use*

The public use doctrine is derived from 35 U.S.C. § 102(b):

§ 102. [in pertinent part]

A person shall be entitled to a patent unless—

    *     *     *     *     *     *

(b) the invention was * * * in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States * * *.

The Supreme Court has held this concept to mean that any use for profit, or other competitive exploitation of an invention for more than the permitted period after the invention is patentable

will invalidate the patent.[2] Judge Learned Hand has suggested that the limitation may be viewed as a period of grace during which the inventor is given time to decide whether to prepare the application.[3] If that period of time is exceeded, he suggests that the inventor is left with the choice of secrecy, or of no protection of any kind.

■ In the instant case, the patent application was filed on May 4, 1967. The question, therefore, is whether there was a patentable machine or invention prior to May 4, 1966, and, if so, whether there was commercial use of that invention prior to May 4, 1966. The evidence presented to the Court shows that the final embodiment of the invention was not ready as of March 30, 1966. On that date, Mr. Giangiulio was advised by a patent attorney to return to the workbench for further development of the slicer. There was evidence that experiments were conducted by Mr. Giangiulio at the delicatessen which he formerly owned, subsequent to the March 30 date and prior to May 4, 1966. It is not clear from the evidence which machine—the final version or an intermediate experimental version—was used for these experiments. However, we find it unnecessary to decide that question. Even assuming that the machine used was the final embodiment of Mr. Giangiulio's idea which was then presented to the patent attorney on May 24, 1966, we have not been convinced that any products of the machine were used for commercial purposes or for profit. We are persuaded that the invention was kept in secrecy while in development, and that any usable model of the slicer was kept from general public view. We have also concluded from the evidence before us that tomato slices made on the slicer were destroyed, and not used in sandwiches for public sale. Any slicing of tomatoes was entirely experimental with a view toward further development and improvement of the invention, and thus did not cause the statutory period to begin to run. Defendant has not met the burden of proof required to establish this affirmative defense.

We note for the record at this point that there is a dispute between the parties as to whether the applicable standard of proof is "clear and convincing" or "beyond a reasonable doubt." [4] It is unnecessary to resolve this issue because defendant has not presented evidence that would even satisfy the lesser standard.

2. *Failure to Set Forth the Best Mode*

The rule of invalidation for failure to set forth the best mode is derived from 35 U.S.C. § 112:

§ 112. [in pertinent part]

The specification * * * shall set forth the best mode contemplated by the inventor of carrying out his invention.

■ This statutory directive is designed to further the general purposes of the patent laws by requiring disclosure of the best method of performing the task the patent is intended to accomplish, so that the public may obtain maximum benefits through complete revelation by the patentee, the *quid pro quo* for the grant of a legal monopoly over the subject matter. Hence, the statute requires good faith statements of the

2. Electric Storage Battery Co. v. Shimadzu, 307 U.S. 5, 20, 59 S.Ct. 675, 83 L.Ed. 1051 (1939).

3. Metallizing Engineering Co. v. Kenyon Bearing & A.P. Co., 153 F.2d 516, 520 (2d Cir.), cert. denied, 328 U.S. 840, 66 S.Ct. 1016, 90 L.Ed. 1615 (1946); Aerovox Corp. v. Polymet Mfg. Corp., 67 F.2d 860, 862 (2d Cir. 1933). When the earlier case was decided, an inventor was allowed two years of public use.

4. Defendant cited the following for the proposition that the standard is by "clear and convincing evidence": Julian v. Drying Systems Co., 346 F.2d 336 (7th Cir. 1965). Plaintiffs, who propound the standard of "beyond a reasonable doubt", have cited: Jones Knitting Corp. v. Morgan, 361 F.2d 451, 455 (3d Cir. 1966).

best method of achieving the desired result known to and appreciated as such by the inventor. Defendant relies upon Engelhard Industries, Inc. v. Sel-Rex Corporation, 253 F.Supp. 832, 837 (D. N.J.1966), aff'd, 384 F.2d 877 (3d Cir. 1967), for the appropriate standards to be applied in determining if the patentee has satisfied this statutory requirement. That opinion cites with approval the following language from Benger Laboratories Ltd. v. R. K. Laros Co., 209 F.Supp. 639, 644 (E.D.Pa.1962), aff'd per curiam, 317 F.2d 455 (3d Cir.), cert. denied, 375 U.S. 833, 84 S.Ct. 69, 11 L. Ed.2d 64 (1963):

> A patentee must disclose the best method known to him to carry out the invention. Even if there is a better method, his failure to disclose it will not invalidate his patent if he does not know of it or if he does not appreciate that it is the best method. It is enough that he act in good faith in his patent disclosure. On the other hand, if he knows at the time the application is filed, of a better method to practice the invention and knows it for the best, it would make no difference whether of not he was the discoverer of that method.

■ Defendant states that the pusher of the machine was changed from "Lexan" (a specific kind of thermoplastic resin) to aluminum in the final commercial version which has been marketed by plaintiffs, because the "Lexan" pusher did not operate as well as aluminum; hence, Kidde argues that the consistent use of aluminum in all machines that have been made and sold establishes that there was a failure to state the best mode of carrying out the invention in the patent, which had described "Lexan" as a possible pusher material. See Finding of Fact 48. Kidde, therefore, contends that we must invalidate the '582 patent for failure to adopt the best mode, just as the court did in Engelhard Industries, *supra*. We disagree.

First, the specification in the patent states only that "the pusher [is] prefer- ably of plastic, although other materials may be used." In the same specification, a particular plastic is suggested. Additional directions in the specification make it clear to the user of the patent that the pusher is to be impermeable to the liquids unleashed by a sliced tomato, and rigid so as to permit it to push a tomato through the racked blades. See Finding of Fact 48. We conclude that the specification adequately discloses the criteria for selecting pusher material and that while it suggests one possible material, it does not limit the choice to that plastic exclusively.

Second, the "Lexan machine" can be operated properly. The difficulty to which defendant refers is the occasional catching of a pusher arm on the blades, thereby jamming the machine. For this litigation, Mr. Giangiulio prepared a machine with a "Lexan" pusher which did not have this difficulty. A simple change in the slots on the pusher solved the problem. By widening the area between the slots so that the spacing is the same as that of aluminum pushers, the supposed defect was rectified. Slot width was not specified in the patent. It was clear that the pusher would have to engage the blades. Any individual of average skill in the art would realize that the slots must be sufficiently wide to permit free passage of the pusher arms through the blade rack. Thus an adequate description of the method for obtaining a properly performing plastic pusher was made.

On this basis alone we are satisfied to reject defendant's contention. However, there are additional factors which support this conclusion. There was considerable testimony at the trial relative to the selection of aluminum as the material for the pusher. We accept the uncontradicted statements of Mr. Giangiulio that he chose aluminum when the Food and Drug Administration changed its regulations and required a special grade of "Lexan" to be used in food processing equipment. This grade costs over five times as much as standard commercial "Lexan" material. In addition, an in-

vestigation into tooling costs for "Lexan" disclosed that the special dies needed for injection-molding the plastic would have cost at least $11,000 in 1966. That tooling cost has continued to rise to over $22,000 now. In contrast, the aluminum pusher can be made on existing equipment with specialized tooling of only $2,000 for an extrusion mold. The differential in the cost of labor, which is higher for aluminum pushers than for plastic pushers, does not come close to this significant initial tooling cost. Moreover, a new injection mold would be required for each prototype that has blades which bear different spatial relationships to each other if the pusher were made of plastic, while only one extrusion mold is required, irrespective of the width of the spacing between blades, when the pusher is made of aluminum.

█ The rule in Engelhard Industries and in Benger Laboratories, *supra*, is good faith in the choice of methods disclosed. If an inventor does not appreciate that one method is better than another, he is not to be penalized for failure to give the alternative method. We are satisfied that Mr. Giangiulio did not knowingly choose to disclose other than that which he believed to be the best method at the time. We are persuaded that he made his choice for disclosure in complete good faith, and that he thought that plastic was in fact the best mode for carrying out the invention. Moreover, the evidence does not support the contention that plastic is not the best mode; plastic is an available and satisfactory material as set forth in the specification.

Finally, we have examined the original opinion in Benger Laboratories. Immediately before the passage cited in Engelhard Industries, Judge Kirkpatrick stated:

The defendants' argument depends for most of its force upon the fact that the plaintiff has from the beginning used in its commercial production a method differing in some particulars from any method of manufacture disclosed by the patent and has been conspicuously successful in marketing its product on a world-wide scale. Of course, there may be many reasons why the plaintiff adopted this method in preference to others, and I do not regard the fact that a patent owner adopts a certain method for its commercial production as by any means conclusive or as compelling a finding that it is the best method although it must, of course, be considered. There is also always a question as to what is meant by the "best" method. There could easily be cases where reasons of economy or other considerations would call for the use of a certain method for production on a large commercial scale, although a greatly superior product might be produced if smaller quantities were desired.

Benger Laboratories, *supra*, 209 F.Supp. at 644. We believe that this observation squares with our decision in this case, and that the result is consistent with accepted precedent in this Circuit, and with the general law on the subject.

█ Thus we conclude that, given all the primary and secondary tests, as well as consideration of the affirmative defenses, the '582 patent is in fact valid. The only remaining issue at this stage of the litigation is that of infringement.

## INFRINGEMENT

Defendant has sold two models of machines which allegedly infringe the '582 patent—the "TK–I" and the "TK–II". The issues with respect to infringement are distinct as to each of them.

The statutory section governing infringement is found in 35 U.S.C. § 271(a):

[W]hoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent.

█ Three separate elements must be established before there can be a

finding of infringement: (1) the invention be made, used or sold (2) during the term of the patent (3) by one without authority to do so.

### 1. *Alleged infringement by the "'TK–I'"*

Kidde does not dispute that it lacked authority to use the patent. Indeed, the parties stipulated that the "TK–I" infringed some of the claims of the '582 patent. The only issue in dispute is whether there was such use during the term of the patent. One of defendant's agents, the General Manager, suggested that sales dropped off sharply after introduction of the "TK–II", which was prior to the issuance of the '582 patent on February 20, 1968. Another agent of defendant, the Restaurant Products Manager, gave a firmer cutoff for sales, at a period in mid- to late 1968. We are persuaded that some sales in all probability did take place after the issuance of the '582 patent. An accounting, which will be ordered in connection with the determination of damages, will reveal the amount of sales, so that damages, if any, may be calculated with certainty.

### 2. *Alleged infringement by the "TK–II"*

Similarly, Kidde does not assert authority to use the '582 patent. In this connection, the parties have stipulated that sales occurred after February 20, 1968. The question is whether the "TK–I" "used" the '582 patent. The primary test for use is what is known as literal infringement. The allegedly offending product is examined to see if each and every element of a claim of the patent is present in that product.

In the words of Mr. Justice Jackson:

In determining whether an accused device or composition infringes a valid patent, resort must be had in the first instance to the words of the claim. If accused matter falls clearly within the claim, infringement is made out and that is the end of it.

Graver Tank & Mfg. Co. v. Linde Air Prod. Co., 339 U.S. 605, 607, 70 S.Ct. 854, 855, 94 L.Ed. 1097 (1950). We have determined the elements of the '582 patent in order to comply with this directive. See Finding of Fact 54. The plaintiffs have argued ingeniously to convince us of the literal infringement of these elements. However, it is just not credible that the detailed provisions of claims 1 and 8 of the '582 patent are literally present in the "TK–II".

Failure to find literal infringement does not end the matter, however. The guidelines of Graver Tank, *supra*, are still the rule in this Circuit. *See* Trio Process Corp. v. L. Goldstein's Sons, Inc., *supra*. The Court in Graver Tank refused to subordinate substance to form by demanding precise literalness, a rule that would make a mockery of patent protection. An imitation can be substantially the same as the claimed patent, while not falling absolutely within its literal bounds. The doctrine of equivalents therefore becomes significant in developing realistic protection for a patentee. The doctrine, which is effective both for a primary invention and for a combination invention, is based upon the thesis that " 'if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form, or shape.' "[5]

---

5. This quote occurs in the context of the following declamation on patent protection:

But courts have also recognized that to permit imitation of a patented invention which does not copy every literal detail would be to convert the protection of the patent grant into a hollow and useless thing. Such a limitation would leave room for—indeed encourage—the unscrupulous copyist to make unimportant and insubstantial changes and substitutions in the patent which, though adding nothing, would be enough to take the copied matter outside the claim, and hence outside the reach of law. One who seeks to pirate an invention, like one who seeks to pirate a copyrighted book or play, may be expected to introduce minor variations to conceal

## File-Wrapper Estoppel

■ Prior to considering the application of the doctrine of equivalents in this case, we will dispose of defendant's allegation of file-wrapper estoppel. Absence of file-wrapper estoppel is a condition precedent to consideration of the doctrine of equivalents. A positive finding of file-wrapper estoppel will bar invocation of the doctrine of equivalents by a patent-holder.

The genesis of the estoppel rule lies in the nature of the proceedings in obtaining a patent. When an application is filed, it triggers a review of the application and of applicable prior art in order to determine whether the application presents the innovation necessary for the grant of patent rights. The examiner may decide that the patent is not sufficiently innovative. He may decide that the subject matter is unpatentable under the patent laws. He may find that there is insufficient clarity in the papers to explain the invention to others. If the examiner finds, for any reason, that a patent should not be granted, he issues a rejection with an explanation of his reasons. This becomes part of the file-wrapper, which is the official case-history of the patent application. An inventor is not foreclosed at this point from obtaining a patent. The failings cited as the basis for rejection may be rectified. A subsequent re-application may be submitted under the same number and file. Ultimately, a patent may be granted. The issue of file-wrapper estoppel relates to the eventual grant of a patent which is the result of this give-and-take. If the preliminary rejection was for obviousness or overbreadth of the subject matter, and the patent was then granted upon the inventor's narrowing the scope of his claims to avoid covering unpatentable or prior-patented material, that inventor may not then have recourse in the courts to recover what he voluntarily abandoned in order to receive the patent.

■ Thus, a finding of file-wrapper estoppel means that the inventor had earlier given up certain claims with respect to his patent that he is now attempting to assert through the doctrine of equivalents in order to establish a basis for his charge that the patent has been infringed.

■ In the instant case, there was an initial rejection of all of the original claims of the application. The reasons assigned were, in the case of certain claims, including original claim 1, indefiniteness, and, for some claims, again including original claim 1, unpatentability in view of two prior art patents. A con-

---

and shelter the piracy. Outright and rare type of infringement. To prohibit no other would place the inventor at the mercy of verbalism and would be subordinating substance to form. It would deprive forthright duplication is a dull and very him of the benefit of his invention and would foster concealment rather than disclosure of inventions, which is one of the primary purposes of the patent system. The doctrine of equivalents evolved in response to this experience. The essence of the doctrine is that one may not practice a fraud on a patent. Originating almost a century ago in the case of Winans v. Denmead, 15 How. (56 N.S.) 330, 14 L.Ed. 717, it has been consistently applied by this Court and the lower federal courts, and continues today ready and available for utilization when the proper circumstances for its application arise. "To temper unsparing logic and prevent an infringer from stealing the benefit of the invention" a patentee may invoke this doctrine to proceed against the producer of a device "if it performs substantially the same function in substantially the same way to obtain the same result."

\* \* \* \* \*

The theory on which it is founded is that "if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form or shape."

\* \* \* \* \*

The doctrine operates not only in favor of the patentee of a pioneer or primary invention, but also for the patentee of a secondary invention consisting of a combination of old ingredients which produce new and useful results.

Graver Tank & Mfg. Co. v. Linde Air Prod. Co., 339 U.S. 605, 607–08, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950) (footnotes and citations omitted).

ference was requested by counsel for Mr. Giangiulio. As a result of this conference, new claims were submitted. New claims 11 and 18, which were accepted and became claims 1 and 8 in the '582 patent, differed from the original claim 1 almost entirely in the explanation of the angular relationships. The basis for the complaint of indefiniteness had been the patent examiner's contention that he could not relate the angles to any physical structure, and thus could not decipher the patent claims. The new description of the angles satisfied the examiner. The objection of unpatentability in view of prior art was dropped without any narrowing or refinement of the claims. In light of this history, which has been documented in exhibits that are part of the record, and which has also been the subject of oral testimony by all parties, we conclude that there has been no narrowing of the substance of the claims for the purpose of obtaining a patent in view of prior art, and, therefore, the doctrine of file-wrapper estoppel does not apply. *See* Trio Process Corp. v. L. Goldstein's Sons, Inc., 461 F.2d 66, 75 (3d Cir.), cert. denied, 409 U.S. 997, 93 S.Ct. 319, 34 L.Ed.2d 262 (1972). Hence we may consider the doctrine of equivalents.

### Doctrine of Equivalents

At first blush, the doctrine of equivalents appears to create a philosophical paradox. We distinguished this invention from other slicing devices in holding that it is valid. Yet now we say we can rely on the doctrine of equivalents to decide the issue of infringement. Have two different and contradictory standards been applied in determining validity in the first instance, and infringement thereafter? The explanation arises from the factor of innovation in this invention which led us to uphold its validity—the solution of the problem of slicing tomatoes mechanically, at a rapid rate, without mangling them. These were, as we have noted, problems which were peculiar to tomatoes.

None of the other patents was capable of slicing tomatoes, even though they all consisted of blades, pushers, bases, and means for movement. It was the arrangement and the special relationships among those elements which made other specialized fruit or vegetable slicers patentable. It is the special angular relationship between the pusher and the blade rack which sits at the center of this invention. It is the technique which makes the invention. Hence, the patent is valid.

█ What then is the rationale of squaring this finding of validity with one of infringement based on the doctrine of equivalents? The latter rule has been developed to give an inventor complete protection of his patent rights. The rule permits a court to determine what elements are *non-essential* (given the premise that every stated element is essential), and what differences in *form* actually are insignificant. One might understand the rule to permit the Court to find infringement when the essence of an invention is used, even though the superficial form may different.

The definitive statement of the rule has been cited in the Graver Tank case. The broad outlines of the test to be applied are as follows:

What constitutes equivalency must be determined against the context of the patent, the prior art, and the particular circumstances of the case. Equivalence, in the patent law, is not the prisoner of a formula and is not an absolute to be considered in a vacuum. It does not require complete identity for every purpose and in every respect. In determining equivalents, things equal to the same thing may not be equal to each other and, by the same token, things for most purposes different may sometimes be equivalents. Consideration must be given to the purpose for which an ingredient is used * * * when combined with the other ingredients, and the function which it is intended to perform.

Graver Tank, *supra*, 339 U.S. at 609, 70 S.Ct. at 856.

The issue in Graver Tank was whether an electric welding flux containing a manganese compound infringed a patent for an electric welding flux containing a magnesium compound. In a landmark decision on this point, the Supreme Court first found no literal infringement. It then applied the doctrine and found that there was infringement, because the manganese compound " 'perform[ed] substantially the same function in substantially the same way to obtain the same result.' " Graver Tank, *supra*, 339 U.S. at 608, 70 S.Ct. at 856.

A great deal of testimony was developed in the instant case to demonstrate the purposes behind the design of the pusher and the nature of the path of movement. Expert witnesses were called by both sides to explain their points-of-view, to give engineering descriptions of the machines in operation, and to demonstrate the functional equivalence or dissimilarity between the "TK–II" and the '582 patent. Several bushels of tomatoes were sacrificed in live demonstrations of the operative features of the "TK–II".

■ We conclude that the pusher of the "TK–II" is for all operative purposes the same as the pusher in the '582 patent's claims 1 and 8, and that the curvilinear path of movement in turn is both the functional equivalent of, and well within the angular range contemplated for the path of movement of the '582 patent. The particular relationships given for the arms of the '582 pusher are descriptive of a means whereby the path of the tomato can be controlled and constrained within certain specified limits over the crucial first third of the cutting phase. It is not significant that one curved piece of metal serves the functions of both leading and trailing arms, since the same can be said of the '582 pusher.

That the "TK–II" was demonstrated as capable of operating with a straight pusher surface still does not negate the conclusions of infringement, because (1) such a machine was never produced by defendant or Redco, and is not a subject of this suit, and (2) the straight-edged pusher still serves the function of guiding the tomato into the blades at a shallow angle at the commencement of the cutting cycle, which is performing " 'substantially the same function in substantially the same way to obtain the same result.' " Graver Tank, *supra*, 339 U.S. at 608, 70 S.Ct. at 856.

The "TK–II" uses a curvilinear path of movement. It has been argued by defendant that this is not the equivalent of a path of movement at a shallow angle to the blade surface. The patent makes clear in the specification and description that the first portion of the cutting path is the crucial phase, for it is during the first third of the slicing action that the skin of the tomato is penetrated. The motion after that is necessary to complete the cutting action, but the process is not fraught with the same problems which are presented in achieving the initial piercing of the fruit. The factual basis of this contention was further demonstrated in court by experts from both sides. The contention was then made by plaintiffs that the curvilinear path of the "TK–II" pusher was within the claim of the patent with respect to this phase of the cutting operation. Defendant's answer was that one cannot speak of an angle to the blade surface for a path which is not straight. We do not agree with the defendant. A curved path will not maintain the same angle to the blade surface, but the angular relationship can be determined. In this case the range of angles is well within that claimed by the '582 patent over the first third of the cutting path. The claims do not specify rectilinear motion, but give instead a range for entry of the tomato into the blades. While the angles may be more difficult to determine for a curved path than for a straight path, they can be determined, as they have been here, and the relevant range of angles is completely covered.

The "TK–II", therefore, with respect to the path of movement of the pusher in relation to the blades, uses the same elements as the '582 patent; namely, the same shallow-entry-angle technique, for the same purpose and in the same manner. The curvature is only slight across the crucial first third of the path. Defendant was not able to demonstrate that the "TK–II" could operate if the angle of approach to the blades was changed drastically. Under all of these circumstances, we find it completely appropriate to apply the doctrine of equivalents to this aspect of the patent and hold that the "TK–II" infringes the angular relationship element of the '582 patent claim.

An additional factor in our determination was the evidence that the two pushers could be, and in fact had been interchanged, without changing the satisfactory operation of the machines.[6]

While it is true there are superficial differences, we believe that the "TK–II" is merely a different-*looking* method of doing that which plaintiff's device achieves in the same manner and for the same purpose. Under the doctrine of equivalents, this constitutes infringement of the '582 patent.

### DAMAGES

No evidence has been presented with respect to damages, due to the bifurcated trial format. Pending a determination of that phase of the case, at which time detailed evidence will be presented as to sales of the "TK–I" and "TK–II" slicers, we will also hold in abeyance any determination as to increased damages, allowable under 35 U.S.C. § 284, and attorneys' fees, awardable in exceptional cases under 35 U.S.C. § 285.

### STATUS OF REDCO

An unusual factor in this case was the failure to join as a party the manufacturer of the infringing machines. We have been asked, however, to make a declaratory ruling as to the binding effect of this decision on Redco, the manufacturer. It is our opinion that such a ruling would be in the nature of an advisory opinion.[7] If a proper case or controversy is brought before us, we will consider the question. Until such time, and in view of the absence of a record on this point, we decline to make any ruling as to Redco at this time on the record before us.

Accordingly, based upon the entire record, including the Findings of Fact, we make the following:

### IV. CONCLUSIONS OF LAW

1. This Court has jurisdiction over the subject matter of this action and over the parties to this action. 28 U.S.C. § 1338 and 35 U.S.C. § 281.

2. Venue lies in the Eastern District of Pennsylvania in this matter. 28 U.S.C. § 1400(b).

3. The subject matter of the patent in suit was not disclosed by or anticipated in the prior art. 35 U.S.C. § 102.

4. The subject matter of the patent in suit was not obvious to a person skilled in the art at the time the invention was made. 35 U.S.C. § 103.

5. The subject matter of the invention was not in public use or on sale in the United States more than one year prior to the date of the filing of the application for the patent in suit. 35 U.S.C. § 102(b).

6. The patent specification contains a description of a preferred embodiment setting forth the best mode contemplated

---

6. In Graver Tank & Mfg. Co. v. Linde Air Prod. Co., 339 U.S. 605, 609, 70 S.Ct. 854, 857, 94 L.Ed. 1097 (1950), interchangeability was described as a significant indicator of the equivalence of two elements:

An important factor is whether persons reasonably skilled in the art would have

known of the interchangeability of an ingredient not contained in the patent with one that was.

7. *See* Aetna Life Insurance Co. v. Haworth, 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617 (1937).

by the inventor for carrying out his invention. 35 U.S.C. § 112.

7. United States Letters Patent 3,369,582 is valid.

8. Defendant's commercial product known as the "TK–I" infringes United States Letters Patent 3,369,582.

9. There is no file-wrapper estoppel applicable to plaintiff's patent.

10. The "TK–II" is in all respects the functional equivalent of United States Letters Patent 3,369,582 claims 1 and 8, and as such infringes those claims.

11. There is no actual case or controversy before this Court as to the non-party, Redco, at this time.

12. Plaintiff is entitled to have the matter proceed so that damages due it, if any, may be ascertained.

## ORDER

And now, to wit, this 21st day of February, 1975, the defendant in this action will have thirty (30) days from the date of this ORDER to file (1) exceptions, if any, to Findings of Fact made by the Court, with specific citation to those portions of the record which constitute the bases for those exceptions; (2) exceptions to the failure of the Court to adopt those proposed Findings of Fact of defendant which were not so adopted, with specific citation to the proposed Findings and the record citation in support of them; (3) exceptions, if any, to the Court's Conclusions of Law and the reasons therefor; and (4) exceptions to the failure of the Court to adopt any of defendant's proposed Conclusions of Law with citations of the proposed conclusions not adopted.

Defendant shall file a memorandum in support of its position, the memorandum to contain a statement of the factual and legal reasons in support of its exceptions to Findings of Fact and Conclusions of Law and in support of its objections to the Court's failure to make such Findings of Fact and enter such Conclusions of Law defendant has previously submitted to the Court.

Plaintiffs will have an additional fifteen (15) days in which to file their reply memorandum, together with all supporting documentation in opposition to any exceptions of defendant, and to any memoranda filed by defendant in support of its exceptions.

If exceptions are not filed by defendant within the stated thirty (30) day period, defendant will be deemed to have waived any objections to the Findings of Fact and Conclusions of Law, and the matter will proceed to a determination of damages.

For the purpose of establishing the machinery and procedure to be utilized in connection with the adjudication of damages, in the event no exceptions are filed, a conference will be held on April 1, 1975, at 2:00 P.M. in Room 2102, United States Courthouse, Philadelphia, Pennsylvania. Otherwise, a future schedule, if required, will be contained in the Order ruling upon the exceptions, if any are filed.

It is so ordered.