BENGER LABORATORIES LIMITED, a
corporation of Great Britain,
Plaintiff,

v.

R. K. LAROS COMPANY, now Pharma-
chem Corporation, a Pennsylvania cor-
poration, Defendant-Counterclaimant,

and

Cutter Laboratories, a California corpora-
tion, Intervenor-Defendant,

v.

ARMOUR AND COMPANY, an Illinois
corporation, Counterclaim-Defendant.

Civ. A. Nos. 26387, 24540.

United States District Court
E. D. Pennsylvania.

Sept. 4, 1962.

See also 24 F.R.D. 450.

Hayward H. Coburn, Drinker, Biddle & Reath, Philadelphia, Charles J. Merriam, Merriam, Lorch & Smith, Chicago, Ill., for plaintiff.

Robert H. Young, Morgan, Lewis & Bockius, Edward W. Mullinix, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., Dawson, Tilton, Fallon & Lungmus, Chicago, Ill., for Armour & Co.

Pennie, Edmonds, Morton, Barrows & Taylor, New York City, for Cutter Laboratories and R. K. Laros Co.

KIRKPATRICK, District Judge.

This is a suit for the infringement of United States Patent Re. 24,642, relating to a therapeutic preparation for the treatment of iron deficiency anemia, reissued April 28, 1959. The plaintiff is Benger Laboratories Limited, a British corporation and owner of the patent by assignment from Messrs. London and Twigg, the inventors. The defendant, R. K. Laros Company (now, by a change of name, Pharmachem Corporation), makes the alleged infringing material and sells it to Cutter Laboratories, which in turn distributes it through subsidiaries. Armour and Company, counterclaim-defendant, is an exclusive licensee

of Benger for the veterinary field in this country.

The defenses are (1) invalidity, by reason of indefiniteness of the claims, obviousness of the invention, failure to disclose the best mode of carrying out the invention and improper reissue, (2) non-infringement, and (3) misuse of the patent in violation of the antitrust laws, which last defense is raised by the defendant Laros in counterclaims against both the plaintiff and Armour.

Although the patented composition is intended for use with both humans and animals, the alleged infringing product is sold only for veterinary purposes and primarily for intra-muscular injection with baby pigs. The record shows that newborn pigs generally suffer from iron deficiency anemia, a condition which results in very substantial numbers not living to maturity.

The problem of correcting iron deficiency anemia in both humans and animals by supplying iron to the blood has been one of long standing. Many persons are unable to tolerate oral administration of iron, at least in sufficient quantities to be effective and, in addition, when so administered, the amount of absorption is extremely low and, of course, for newborn pigs oral administration is out of the question. There are iron preparations which can be safely administered intravenously and are widely so used with humans but unless the injection is performed by a person having professional skill very undesirable side effects frequently follow. In the case of piglets this would mean that the farmer would be put to the expense of employing a veterinarian.

Much study, research and experimentation have been devoted to efforts to prepare an iron composition which could be safely injected intramuscularly with both animals and humans for rapid and complete absorption of the iron into the bloodstream—a highly important quality in many cases. There is no proof to be found in this record that any such material had been made or marketed prior to the plaintiff's patent.

The plaintiff, beginning as early as 1947, has been making and selling a therapeutic preparation containing iron which is still successfully used for intravenous administration to humans. Two or three years later it began the manufacture of dextran in commercial quantities as a blood plasma extender. Not long after that it embarked upon an intensive search for an intramuscularly injectable iron preparation, having reached the conclusion that the intravenously injectable product which it then was making could not be modified for that purpose. This project was at first committed to London and Twigg, employees of the plaintiff. After a number of failures the project became dormant for several months until September 1952 when the inventors hit upon the idea of trying dextran (which was readily available at the plaintiff's plant) as a carrier for the iron. It was found that the material produced by its use was what the plaintiff was looking for and, on February 27, 1953, a provisional specification for a British patent was filed by the inventors.

A year later, on February 23, 1954, the complete specification was filed and a British patent issued. On the following day an application for the American patent was filed together with priority documents claiming the date of the British provisional. The American patent issued January 21, 1958, and the reissue, which is the patent in suit here, was applied for September 28, 1958, and issued April 28, 1959.

The patent claims both product and process. Claim 1 is as follows and may be taken as representative of the product claims:

A composition comprising a substantially nonionic complex of ferric hydroxide with a dextran having an average intrinsic viscosity at 25° C. of about 0.025 to about 0.25, said complex being stable in contact with water.

Claim 8 is representative of the process claim and is as follows:

The process of preparing a substantially non-ionic colloidal ferric

hydroxide-dextran complex which comprises combining, in contact with water, a dextran having an average intrinsic viscosity at 25° C. of about 0.025 to about 0.25 with ferric hydroxide, said ferric hydroxide being formed in situ in contact with the dextran by a double decomposition reaction between an ionizable ferric salt and an alkali base.

The defense that the claims are indefinite and fail to particularly point out and distinctly claim the invention, as required by 35 U.S.C. § 112, is mainly based upon the fact that the product is described in the claims as a complex, and the defendants' argument is, in effect, that "complex" is a word of so indefinite and varied meaning as to leave the identification of the product to the imagination.

It is true that the term "complex" is used in the science of chemistry to describe compositions of matter as to the chemical or physical structure of many of which no generally accepted understanding has been arrived at by scientists and it is also true that there will be different kinds of complexes falling within almost any definition. An expert called by the plaintiff, speaking with reference to the product now before the court, testified that "if you can demonstrate that a given substance is not a 'mixture' and also that it is not a 'compound', it necessarily follows that it is a 'complex'"—a statement not challenged at the trial.

■ The precise chemical structure of the claimed product is not known to either the plaintiff or the defendants, nor to any of the impressive array of experts whom they called and, being unknown, it is not nor can it be described or claimed by chemical structural formula. However, nothing in the law requires the courts to deny a patent to the inventor of a new and useful product merely because laboratory technique has not advanced to a point where the chemical structure can be recognized and described. All that is necessary is that the patentee make as full disclosure as he reasonably can and that he describe the product with sufficient particularity that it can be identified and that those who are interested in its manufacture are enabled to determine what will and what will not infringe.

A number of characteristics of the complex of the patent are set forth in the claim. It is non-ionic, it consists of ferric hydroxide and dextran of a specified viscosity, and it is stable in contact with water. The great weight of the expert testimony is to the effect that, whatever its chemical formula may be, it can be distinguished by chemists from both mixtures and compounds.

[2, 3] I think that the product is sufficiently identified and that the claims meet the requirements of the law in that respect. The Patent Office was satisfied with the identification, and the patent, having issued, is presumed to be valid. The evidence does not justify me in concluding that the Patent Office was in error.

The process claims are attacked on the additional grounds of misdescription and failure to include an essential step. Since, as will appear below, I have held these claims invalid for another reason, it would be unprofitable to extend this opinion by a discussion of this point.

■ Validity is also questioned by the defendants' contention that the invention was an obvious one in view of the prior art. On this point the product and process claims must be considered separately.

As to the product claims. The composition of matter is novel. Unlike the earlier compositions, it can be intramuscularly injected in comparatively large doses without ill effects. This was a new and unexpected result. Even the most skilled research chemist could not predict this property with any reasonable probability of being right. Our knowledge of biochemistry falls far short of permitting such predictions.

The prior art discloses the use of high molecular weight carbohydrates quite similar to dextran as complexing agents for ferric hydroxide, but nowhere is there any teaching that a product so made can

be safely injected intramuscularly. These preparations are described in the literature of the prior art sometimes as intravenously and in other instances as parenterally injectable. The word "parenteral" is equally applicable to intramuscular and intravenous injection, but there is nothing in the prior art to indicate that it was ever used to mean intramuscular injection, which there almost certainly would have been if that had been the meaning intended. At best, it is an ambiguous term and the patent will not be invalidated on an ambiguity.

■ I know that both London and Twigg, the inventors, testified that the choice of dextran as a carrier for the iron was obvious. I doubt that their testimony means more than that the facts that dextran was available in their employer's plant and that it would be advantageous to a dextran manufacturer to find a new use for it made it a natural choice of a substance with which to experiment. Moreover, these two gentlemen left the employ of the plaintiff deeply resentful of what they considered the plaintiff's failure to give proper recognition to their efforts. They were unquestionably hostile witnesses and, with that fact in mind, I have on this particular point discounted their testimony.

I, therefore, hold that claims 1 to 5, inclusive, and 12 embody a non-obvious invention.

■ The process claims are admittedly old except for the selection of dextran as the complexing agent. The prior art teaches that, in order to obtain a successful complex, the ferric hydroxide should be formed in situ by double decomposition reaction in the presence of a complexing agent. The complexing agents of the prior art are sugars, starch, dextrin (a degradation product of starch) and certain gums. All of these are carbohydrates, as is dextran. The chemical structure and behavior of dextrin in particular is very similar to that of clinical dextran. This being so, a chemist familiar with the prior art certainly should have expected that dextran would form a stable complex with iron by the process claimed in the patent. The selection of the particular fraction of dextran used, it seems to me, did not involve more than the ordinary skill of a scientist familiar with the art. The purpose was to obtain an injectable preparation which therefore should not be too thick to be used in a hypodermic needle and it was obvious that too high viscosity would defeat this purpose.

I am of the opinion that the process claims are for an invention which, in view of the prior art, was obvious to one having ordinary scientific knowledge.

■ To appreciate the reason why the process is an obvious one while the product is not, one must have clearly in mind the objective of the invention claimed respectively in the process and product claims. The process claims do not even suggest anything of a therapeutic nature. The desired end result of the process was simply the production of a stabilized ferric hydroxide solution. That the admittedly old steps of the process would result in obtaining such a solution if dextran were the carbohydrate used could not but have been obvious to a skilled worker in the field, but that is all that was obvious. What was not obvious was that the solution produced would be intramuscularly injectable, and the discovery that it would have this unexpected and unpredictable property qualifies it as patentable. In other words, all that the process was aimed at was the creation of a certain composition of matter and, that having been accomplished by an obvious method, the fact that the finished product had a new and unexpected property does not make the process patentable.

The foregoing thought is clearly brought out in the opinion of the Court of Customs and Patent Appeals in the case of Application of Larsen, 292 F.2d 531, a case involving a therapeutic compound, in which the Court said, "it is clear * * * that the allowance (by the Patent Office) of the claims to the compounds was based on the fact that they possessed unique, and presumably unex-

pected, properties. \* \* \* Under these circumstances, however, the inventive concept is that of the compounds themselves. When they have been conceived, the processes by which they may be prepared may or may not be obvious. If, as is the case here, such processes, given the idea of the compound, are obvious then it is apparent that the invention resides in the compounds per se and is not properly defined as a process."

▪ The next attack upon the validity of the patent is that the specification does not disclose the best mode contemplated by the inventor of carrying out his invention as required by 35 U.S.C. § 112. The defendants' argument depends for most of its force upon the fact that the plaintiff has from the beginning used in its commercial production a method differing in some particulars from any method of manufacture disclosed by the patent and has been conspicuously successful in marketing its product on a world-wide scale. Of course, there may be many reasons why the plaintiff adopted this method in preference to others, and I do not regard the fact that a patent owner adopts a certain method for its commercial production as by any means conclusive or as compelling a finding that it is the best method although it must, of course, be considered. There is also always a question as to what is meant by the "best" method. There could easily be cases where reasons of economy or other considerations would call for the use of a certain method for production on a large commercial scale, although a greatly superior product might be produced if smaller quantities were desired.

▪ A patentee must disclose the best method known to him to carry out the invention. Even if there is a better method, his failure to disclose it will not invalidate his patent if he does not know of it or if he does not appreciate that it is the best method. It is enough that he act in good faith in his patent disclosure. On the other hand, if he knows at the time the application is filed, of a better method to practice the invention and knows it for the best, it would make no

difference whether or not he was the discoverer of that method. The answer to the question of sufficiency of disclosure of best method must be determined in the present case as of the time that the American application was filed.

▪ It appears that after the patentees had disclosed their invention to their employer a controversy arose between them and another scientist who was in charge of commercial production. The latter (Fowler) wanted a method of production which would be efficient and give reliable and consistent results. The methods used by the patentees in their laboratory work produced the desired results but not consistently and Mr. Fowler became engaged with the patentees in a dispute as to the best method to achieve *his* objective. The patent applications were filed while this dispute was going on and, though commercial production proceeded in accordance with Fowler's method, London and Twigg remained unconvinced for some time.

On February 24, 1954, the date on which the parent application was filed in this country, London and Fowler were still, as a witness described it, at swords points in their dispute as to whether the Fowler method (calling for heating before adding ferric hydroxide, and subsequent neutralization) was better than the London and Twigg method embodied in Examples 1 and 2 of the specification. The plaintiff had just completed its first commercial size batch, using the Fowler method. Thereafter, other commercial size batches were completed but none were sold, owing to discovery of toxicity in some of them—a condition not arising from the process itself but traced to the mechanical equipment used in carrying it out. No product was sold until September 1954, and it was sometime in 1954 before even Fowler was entirely convinced that his process was reproducible. London did not admit that Fowler was right until the end of 1955.

The defendants, in support of their argument, point to the fact that Example 3 of the specification, which referred to dissolving the dextran and the alkali base

in hot water *before* adding the ferric chloride, did not appear in the parent patent application filed in this country. It appears that the inventors, during their development work, used a batch of dried dextran which the plaintiff happened to have on hand and which, in its dried state, was difficult to get into solution and that, in order to dissolve it, they invariably heated the water. The absence of specific mention of this preheating step from the specification is relied on by the defendants as evidence of an intent to conceal it. However, the evidence as a whole satisfies me that the inventors did not attribute any particular significance to it and that, even if it had been a step which made the method of manufacture in which it was used the best method (a fact not proved), they were not aware of it.

Under these circumstances, I cannot say that either the Fowler method or that of Example 3 was "contemplated by the inventor" as the best method of carrying out the invention.

In any event, Example 3 now appears in the specification of the reissue, and we will proceed to examine the question whether it is properly there.

The defendants contend that the patent is invalid because improperly reissued.

Priority, as of the date of the filing of the British provisional, was claimed along with the original application for the American patent. The British provisional contained Example 3 only, but the American application omitted Example 3 and followed the British complete which set forth only Examples 1 and 2.

The reissue statute (35 U.S.C. § 251) provides as conditions for a reissue that the patent be "deemed wholly or partly inoperative or invalid, by reason of a defective specification or drawing," that the defect or defects to be corrected shall have arisen "through error without any deceptive intention," and that "No new matter shall be introduced into the application for reissue." The

defendants take the position that the reissue was improper and illegal for several reasons: (1) that the purpose and policy of the law does not allow reissues for the sole purpose of improving a claim for priority [1], (2) that Example 3 was omitted from the American application (and also the British complete specification) intentionally and not by error or inadvertence, and (3) that the insertion in Example 3 in the application for reissue added new matter to the patent.

I do not find any authority supporting the proposition of law on which the defendants base their first reason. In Ex parte Arkless, 116 U.S.P.Q. 214, a decision of the Board of Appeals of the Patent Office relied on by the defendants, the applicant had failed to make his claim for priority in accordance with the Patent Office rules, which left his application as though no claim at all had been made, and it was held that this amounted to a waiver and could not be corrected by reissue procedure. The case goes no further than to say that a claim for priority cannot be validly made for the first time in an application for reissue.

In the present case the claim for priority was timely made with the supporting documents, including the British provisional specification in which Example 3 was set out. However, the American application omitted what the plaintiff thought might be the only working example which would justify the date claimed for priority, and it was to remedy this omission that the reissue was applied for.

The patent was thus, by reason of a defective specification, deemed partly inoperative in that it was, at least, believed to be incomplete so far as establishing the priority date to which the patentees were entitled. The statute appears to have been drawn with the intention of giving the Commissioner a degree of discretion in the matter of reissues. The words are "Whenever any patent is * * * deemed * * * partly inoper-

---

1. The plaintiff does not dispute that this was its only purpose in applying for the reissue.

ative * * * the Commissioner shall * * * reissue the patent." Certainly the verb "deemed" can only refer to a decision by the Commissioner. In the present case the Commissioner evidently deemed the specification partly inoperative and in his discretion reissued the patent.

■ As to the contention that the example was omitted intentionally, the burden is upon the defendants. The plaintiff's explanation as to the way in which Example 3 came to be omitted from its American application is in my judgment entirely credible and it satisfactorily establishes "error without any deceptive intention" and negatives the defendants' charge of fraud. Upon this point the defendants offered proof of several circumstances which might give rise to some suspicion of deceptive intent. However, the charge is, in effect, fraud and it takes more than suspicion to establish it. Beyond all this, in view of the ruling in Topliff v. Topliff and Another, 145 U.S. 156, 171, 12 S.Ct. 825, 831, 36 L.Ed. 658, "That this court will not review the decision of the Commissioner upon the question of inadvertence, accident or mistake, unless the matter is manifest from the record" and a number of cases which followed it, it would be hardly necessary to say more than that intentional concealment is not manifest from this record.

■ As to the third reason, the only ground upon which it could be held that the insertion of Example 3 in the application for reissue was the introduction of new matter is that Example 3 was the only disclosure of the best method of practicing the invention. It has already been held that the proof falls short of establishing that fact. The fact that the processes of Examples 1 and 2 were demonstrated to have produced a usable product, the fact that the defendant Laros produces an infringing product on a large commercial scale by a different process than Example 3, and the fact that the very successful commercial production of the plaintiff differs in some respects from Example 3 all seem to make it at least a matter of grave doubt whether Example 3 is the best mode. At any rate, the defendants have failed to meet the burden of proving by evidence satisfactory to the Court that the inventors at the time the application was filed thought it was.

I, therefore, conclude that the reissue of the patent was proper and in accordance with the provisions of 35 U.S.C. § 251.

■ As to infringement, the testimony of the experts is in sharp conflict as to whether or not the defendants' product is or contains a complex. The defendants' principal expert, who was highly qualified, gave it as his opinion that instead of being a complex it is a suspension of finely divided particles of ferric hydroxide in the colloidal range and that these particles were simply coated with the dextran—a fact which prevented them from coalescing and precipitating. The plaintiff's equally qualified experts were of the opinion that it contains a true complex. The experts were examined at length and all were subjected to searching cross-examination. I accept the opinion of the plaintiff's experts, particularly that of Dr. Wolfram. In addition to the expert testimony upon the point, there is plenty of evidence by way of admissions by the defendants. In all of their advertising they refer to the product as a complex, and Laros represented to the Food and Drug Administration that it was a complex and, in correspondence with the plaintiff, referred to it as a complex. I find that it is.

In view of the foregoing finding, the only question remaining is whether it is or contains the complex of the patent. Like the patented product, it is non-ionic, stable in the presence of water and of the proper viscosity to fall within the claims, and it is a complex of ferric hydroxide with dextran.

It may be that these characteristics do not, without more, establish infringement, because of certain tests proposed by the plaintiff itself for identifying the claimed product. In the course of prosecuting its application in the Patent Office,

the plaintiff represented to the examiner that the "claimed complex" was a substance which (1) was rapidly absorbed when injected intramuscularly, (2) remained clear upon the addition of an equal volume of hydrochloric or sulphuric acid, and (3) produced a black tarry deposit when an equal volume of alcohol was added.

As to the first of these representations, no more evidence is needed than the defendants' considerable volume of advertising which represented the product as being intramuscularly injectable and rapidly absorbed.

The Fowler affidavit (the document in which the representations referred to were made and the claimed complex identified) points out the difference in the results of the last two tests between the reaction of the complex of the patent and that of a simple admixture of a colloidal ferric hydroxide with a solution of a low molecular weight dextran. The reactions of the plaintiff's product described define its complex and, to prove non-infringement, the defendants undertook by experiments performed in the courtroom in the presence of the Court to show that their product differed in its reactions from that of the plaintiff. The tests were performed in accordance with the directions of the Fowler affidavit, using a sample of the plaintiff's commercial product (which was accepted by all parties as being the patented product) and a sample of the defendant's.

In the second, or acid, test both products remained clear, although after a number of hours the defendants' product precipitated.[2]

In the alcohol test, certain differences appeared, but these differences were more apparent than real. The plaintiff's product, when an equal volume of alcohol was added, precipitated a black oily tar with some brownish material present, the defendants', on the other hand, precipitated a brownish material. However, the plaintiff produced evidence of laboratory tests which showed that, when only half the quantity of alcohol was added to the defendants' product, a brown material first precipitated, but that when the remaining half of the alcohol was added to the supernatant fluid, bringing the volume of alcohol up to equality with that of the solution (as required by the Fowler affidavit), a black tarry deposit appeared. An expert (Dr. Wolfram) called by the plaintiff testified that the tarry deposit was present in the precipitate of the defendants' product in the courtroom test and that it indicated the presence of the complex claimed in the patent but was hidden by the brown material when the full amount of alcohol was added at one time. He supported his opinion by thoroughly considered reasons, which need not be set out in detail here. I accept this testimony and find that the defendants' material tested corresponded to the complex described in the file wrapper of the patent.

Moreover, I cannot accept the theory that the defendants' product is nothing more than a stabilized colloidal suspension of ferric hydroxide. It seems to me that the results observed during the steps of manufacture, particularly the rise in pH during the first autoclaving and the fall in pH during the second, are more consistent with something akin to a chemical reaction than the simple physical coating of finely divided particles. This is not to say that the defendants' expert is entirely mistaken in thinking that the defendants' product will contain colloidal particles of ferric hydroxide surrounded by dextran. It may well contain these, but I am satisfied that it also contains the complex of the patent in suit, and this fact is enough to establish infringement of the product claims.

2. I do not think that this fact differentiates it from the claimed product. It is true that the Fowler affidavit said that the claimed complex *remained* clear, but these words were used in a comparison of it with the reaction of a simple mixture which precipitated immediately upon the addition of the acid. I do not think that it was intended to mean that the complex remained clear indefinitely.

Although the process claims have been held invalid, approved practice requires a ruling upon the issue of their infringement. The principal argument for non-infringement is that the defendants' process cannot properly be described as a double decomposition reaction. This may be true, but it is a full and well known equivalent. The patent contains an example in which a carbonate was used in the reaction and a fair interpretation of the claim required that double decomposition should include reactions where the hydroxide ion is formed by the degeneration of the carbonate ion. The defendant Laros uses ferric chloride and sodium carbonate in its process. It washes away the excess ferric chloride and the resultant reaction can hardly be other than an equivalent of double decomposition.

█ The defendants infringe both the product claims and the process claims.

The defense of misuse of the patent, in violation of the antitrust laws, is based upon the licenses granted by the plaintiff. The plaintiff is not engaged in the sale or manufacture of the patented product in the United States. It has granted two exclusive licenses, one to Armour and the other to Lakeside, for manufacture and sale within the United States, Armour being restricted to the veterinary field and Lakeside to the human field. Each license contains the provision that the licensee shall not "assign or otherwise deal with any rights * * * created by this agreement" without the plaintiff's consent. This provision clearly forbids the granting of sublicenses without such consent, and Armour and the plaintiff have so construed and acted upon it.

Sometime after the grant of the licenses, an infringement suit was brought by the plaintiff against Fort Dodge Laboratories, one of the defendant Laros' customers. The case was settled and, as a part of the settlement agreement, the plaintiff granted a non-exclusive license to sell with a contingent right to manufacture to Fort Dodge, Armour having agreed, in consideration of a reduction of royalties, to the requisite modification of its exclusive license.

A patent is, for all practical purposes, a grant of a monopoly and this monopoly is not forbidden by the Sherman Act nor is it illegal for the patentee, by means of an exclusive license, to transfer a part of his rights. In the absence of express provisions to the contrary, the grant of an exclusive license impliedly precludes the patent owner from competing with the licensee in the patented product.

Though the grant of an exclusive license is not per se a violation of the antitrust laws, it may be an instrument by which an unlawful restraint of trade or a monopoly is created. However, in order to sustain a charge of violation of the antitrust laws through the instrumentality of a patent or patents, there must be evidence of an intent to create an unlawful restraint or monopoly, together with conduct effective to bring such restraint or monopoly into being. This was the point upon which violation was predicated in United States v. Besser Mfg. Co., D.C., 96 F.Supp. 304, cited by the defendants.

█ In the present case, there is no such evidence, and it is the defendants' burden to establish the defense of misuse. The defendants' case upon the point comes down to (1) the fact that both licenses made the granting of a sublicense possible only with the consent of the plaintiff, plus (2) the asserted fact that the plaintiff is a competitor (potential, if not actual) with its licensees and that their arrangements make it possible to establish a practical monopoly in the United States.

It is undisputed that there is no actual competition between the plaintiff and the licensees and there is no evidence whatever of any prospect that there ever would be. The non-exclusive license granted to Fort Dodge does not add any substance to the charge of an attempt to establish an unlawful monopoly or restraint of trade. It carried with it no power to veto further licenses by Benger or sublicenses by Armour. The rights

of Benger and Armour remained the same except that another distributor entered the market.

An order may be submitted in accordance with the foregoing opinion.